**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

MICHAEL MALCOM, ASHLEY
PRINCE, and NIKKI FAWCETT,

        Defendants.

No. CR11-3057-MWB

**ORDER REGARDING
MAGISTRATE'S REPORT AND
RECOMMENDATION
CONCERNING DEFENDANT
MICHAEL MALCOM'S MOTION TO
SUPPRESS**

---

**TABLE OF CONTENTS**

*I.* *INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A.* *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B.* *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II.* *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   *A.* *Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   *B.* *Objections To Report and Recommendation* . . . . . . . . . . . . . . . . . 16
      *1.* *Summary of the Indictment* . . . . . . . . . . . . . . . . . . . . . . 16
      *2.* *Witness testimony* . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      *3.* *Nexus between evidence and the place searched* . . . . . . . . . 19
      *4.* *Leon good faith exception* . . . . . . . . . . . . . . . . . . . . . . . 22
      *5.* *Fruit of the poisonous tree* . . . . . . . . . . . . . . . . . . . . . . 24

*III.* *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# I. INTRODUCTION AND BACKGROUND

## A. Procedural Background

On December 16, 2011, an Indictment was returned against defendant Michael Malcom and two co-defendants charging Malcom with sexual exploitation of children, and aiding and abetting such conduct, in violation of 18 U.S.C. §§ 2, 2251(a), and 2251(e) (Counts 1 and 2); conspiracy to sexually exploit children, in violation of 18 U.S.C. §§ 2251(a) and 2251(e) (Count 5); interstate transportation of a minor with intent to engage in criminal sexual activity, and aiding and abetting such conduct, in violation of 18 U.S.C. §§ 2 and 2423(a) (Count 6); and interstate transportation of a person with intent to engage in criminal sexual activity, and aiding and abetting such conduct, in violation of 18 U.S.C. §§ 2 and 2421 (Count 7). On April 30, 2013, Malcom filed a Motion to Suppress in which he seeks to suppress evidence seized during searches of his residence and business conducted pursuant to a search warrant. Malcom argues that the search warrant application "failed to establish probable cause to issue the warrant" because "there was no nexus between the contraband being sought and the places to be searched." Defendant's Motion to Suppress at ¶ 3. Malcom contends that this is because "there was no fair probability that contraband or evidence of criminal activity would be found at the Defendant's residence or business." *Id*. at ¶ 8. Malcom also seeks to suppress statements he made to a law enforcement agent as "fruit of the poisonous tree." Finally, Malcom seeks to suppress evidence seized pursuant to a second search warrant on the ground that the affidavit in support of the second search warrant fails to establish probable cause. Thus, he argues the evidence and his statements were obtained in violation of the Fourth Amendment of the United States Constitution.

Malcom's Motion to Suppress was referred to Chief United States Magistrate Judge Paul A. Zoss, pursuant to 28 U.S.C. § 636(b). On May 9, 2012, Judge Zoss conducted

2

an evidentiary hearing at which the prosecution presented the testimony of Webster County Deputy Sheriff Jason Bahr, and Iowa Division of Criminal Investigation Agents Larry Hedlund and Matthew Anderson. On May 14, 2012, Judge Zoss filed a Report and Recommendation in which he recommends that Malcom's Motion to Suppress be denied.

In his Report and Recommendation, Judge Zoss concluded the facts contained in the search warrant application were sufficient for the magistrate to conclude that evidence of child pornography likely would be found at Malcom's residence. Judge Zoss further concluded that, even if probable cause did not support the search warrant, suppression of the evidence seized pursuant to that warrant is not appropriate because the *Leon* good-faith exception applies. *See United States v. Leon*, 468 U.S. 897, 922-23 (1984). Therefore, Judge Zoss recommended that Malcom's Motion to Suppress be denied.

Malcom has filed objections to Judge Zoss's Report and Recommendation. The prosecution has not filed a response to Malcom's objections. I, therefore, undertake the necessary review of Judge Zoss's recommended disposition of Malcom's Motion to Suppress.

### B. Factual Background

In his Report and Recommendation, Judge Zoss made the following findings of fact:

> On September 17, 2010, Webster County Deputy Sheriff Jason Bahr applied for and obtained a warrant to search the defendant Michael Malcom's residence and his business, Humboldt Ag Supply. Doc. No. 64-2 ("Def.'s Ex. A"). In his affidavit in support of his search warrant application, Deputy Bahr stated the following:
>
> > On Wednesday, September 15, 2010 I was contacted by Fort Dodge Police Officer, Matt Lundberg, in regards to wanting assistance

3

with a possible child exploitation case and asked that I speak with the victim. I was at that time introduced to Paula [Redacted] and her 17 year old daughter [D.] Paula explained that on Friday, September 10, 2010 she was driving into her apartment complex parking lot where she now lives in Huxley, Iowa when a white truck pulled up behind her. She got out of her vehicle and spoke with the driver who she described as a professional looking middle aged man. She stated the male asked her if she knew which apartment a girl by the name of [D.] lived in. Paula asked him why and he stated that he was coming to visit her. She asked this male who he was and he stated he was [D.'s] uncle to which she stated that she was her mother and that she did not know him. He then explained that he really wasn't and when Paula asked him what a middle aged man was doing looking for a 17 year old girl he drove away. She stated that she questioned [D.] about this man and [D.] ended up telling her that a mutual family friend by the name of [N.] had arranged with this man to take naked pictures of her and that [N.] gave her some of the money he paid. Paula stated that [the] daughter said this occurred more than once. Officer Lundberg completed a report.

I then spoke with [D.] who stated she is a 17 year old female with a date of birth of [redacted]. She explained that she used to live in Fort Dodge when she was little but had moved to Oklahoma. She explained that [N.] was a mutual friend of both her mom and her and that when they moved back to Fort Dodge, they moved in with [N.] at [redacted] in Fort Dodge, Iowa. She explained that [N.] did not work and

that she had an older male who she said he was a "trick that got her pregnant," and who now gives her $700 a week.  She stated that [N.] has two children.  She also said that [N.]  told her about how she "turned tricks" or prostituted for money.  [D.] also stated that she believed that [N.] sold marijuana and that she saw marijuana in the house numerous times.  [D.] said that [N.] asked her if she wanted to make some money, and explained that all she had to do was let a guy take pictures of her naked.  [D.] said she went with [N.] to a motel in Fort Dodge where they met an older male subject in his room who gave her lingerie to wear and he then took pictures of her with a digital camera.  She explained that he did have her take the lingerie off and pose naked while he photographed her.  She explained that [N.] stayed in the room with her while this took place.  She stated that the guy paid [N.] $500 and that [N.] gave her $250.  [D.] stated that she believed this occurred in late June 2010 and that she was 16 years of age at the time.  She stated that [N.] took her another time to the same motel and she met with the same older male but this time [N.] did not stay with her.  She stated she was again asked to put on lingerie and eventually strip while the older male took pictures of her naked.  She stated though that the older male then asked her to masturbate while he videotaped her which she said she did because he pushed her to do it.  She stated that the older male also masturbated while filming her.  [D.] also stated that the older male then also asked her to perform oral sex on him but she refused.  She said that [N.] returned to the hotel room at which time the older male paid [N.] and [N.] again gave her $250.  [D.] stated this occurred

once more at the same hotel with the same older male which she again was asked to wear lingerie, was photographed naked, and did masturbate while being videotaped. She also stated that this adult male then gave her a ride back to [N.'s] apartment where he again paid [N.] and then [N.] paid her. I asked [D.] to describe the lingerie that the older male asked her to wear and she stated it was a black bra, black thong panties with stringed hips, and a red 1 piece teddy. I asked [D.] to describe the camera and video camera that this older male used to take pictures and video of her. She stated the camera was a digital camera with the screen on the back and was black in color. She described the video camera as silver with a flip out screen. I asked [D.] to describe the adult male who she met at the hotel each time. She stated he was an older male with graying hair and was always dressed nice. She stated [N.] called him either Mike or Humboldt and that he drove a full size white truck and she knew his number to be 515-[redacted]. She also explained that this older male did tell her that he was married and that he owned a business. She also asked the older male what he was going to do with the pictures he took of her and he explained to her that he would add them to his collection. She had asked him if he had other girls he photographed and he stated that yes he photographed a [V.] and [A.] He told her he liked younger girls and asked her if she knew any other girls that she could bring that were younger than her. [D.] stated that all three of these visits to the hotel occurred in the months of June, July and early August although she did not have specific dates. She did explain that they

always occurred in the middle of the afternoon. [D.] was unable to tell me what the name of the hotel was that she was taken to but told me that she would remember the hotel when she saw it and knew it was out by Menards in Fort Dodge. At that time I drove [D.] to numerous hotels in Fort Dodge by Menards but she did not recognize any of them as the hotel she was at when being photographed. As we were driving back towards the Law Enforcement center she pointed out the Economy Inn located at 3003 5th Avenue South, which we then drove into the parking lot and she stated that yes this was the motel. I drove her by the rooms and she pointed out 3 different rooms as possible rooms she went into but was not completely sure because she believed she may have been in the same room for two of the meetings. The room numbers she pointed out were 21, 22, and 24. [D.] told me that before school started in August, her mother and her moved out of [N.'s] apartment and moved into an apartment in Huxley, Iowa.

In the process of investigating the allegations that [D.] had made I found that the telephone number she gave me that she said belonged to a Mike or Humboldt belonged to a Michael J Malcom from Humboldt, Iowa. Upon checking the Iowa Drivers license records I found that Michael J Malcom had a valid Iowa Drivers License, had a date of birth of [1956], was 6'0", 245 lbs. and listed his address as 8 Maplewood, Humboldt, Iowa. I then checked for any vehicles that were registered to Mr. Malcom and found that he had 4 vehicles total registered to him. One vehicle was a white 2001 GMC Sierra 2500 pickup that was registered

both to Mr. Malcom and to a company by the name of Humboldt Ag Services located at 2237 220th Street in Humboldt, Iowa. There was also a Red 2005 Ford F-150 pickup also registered to Mr. Malcom and Humboldt Ag Services. There were lastly two vehicles registered to Mr. Malcom and a Diane Malcom, a 2006 Maroon Chevy Impala, and a 1999 Grey Pontiac Grand Prix. I also at that time requested a copy of Mr. Malcom's driver's license photograph which was placed in a photo lineup. I also completed a property check of both properties through the Humboldt County Assessor and found that the property located at 8 Maplewood in Humboldt showed the deed belonging [to] Michael J and Diane B Malcom. The property located at 2237 220th Street in Humboldt, Iowa showed the deed belonging [to] Michael J Malcom.

I then checked the drivers license record of [N.] and found that [N.] did have a suspended drivers license in the state of Iowa and listed an address of [redacted] in Fort Dodge, Iowa. I also checked for vehicles registered to [N.] and found one vehicle a silver 2006 Chevrolet Impala with Iowa license plate [redacted] and VIN #[redacted] that was registered to [N.] and [redacted].

On 09-16-2010 I met with both Paula [Redacted] and [D.] at the Webster County Law Enforcement Center. I again spoke with Paula [Redacted] outside the presence of her daughter and asked her if she thinks she would remember the adult male that she saw outside her apartment in the white truck. She stated she believed that she would. I then showed her the photo lineup

8

that was created and contained Michael Malcom's drivers license photo in position #4. Paula [Redacted] identified Michael Malcom's photo as the male she saw in the white truck outside her apartment. I also met with [D.] outside the presence of her mother and also asked if she believed she would be able to remember the older male who photographed her if she saw him again. She stated that she would. I then showed her the photo lineup that had been created and contained Michael Malcom's drivers license photo in position #4. [D.] identified Michael Malcom's photo as the male she met at the hotel and took photographs and video of her.

On 09-17-2010 I drove to the residence located at [redacted] in Fort Dodge, Iowa and did see parked behind the residence a silver 2006 Chevrolet Impala that had Iowa license plate [redacted] that I know is registered to [N.]

It is this officer's belief based on the information obtained in this investigation that there is probable cause to believe there may be items or evidence at or contained in the locations listed above that may be beneficial to this investigation. Based upon my knowledge, training, and experience, and the experience of other law enforcement personnel, your Affiant knows that searches and seizures of evidence from computers and digital media containers commonly require law enforcement officers to seize most or all computer items (hardware, software, and instructions) to environment.

Def.'s Ex. A at 5-7 (internal citations to attachments omitted).

At the suppression hearing, the government called three witnesses. Detective Bahr testified that during the search of the defendant's home, officers found a satchel in the attic bearing a "Pioneer" logo. Officers found a digital camera, pornographic photographs, and electronic storage media, including an SD Pro card, in the satchel. A file on the SD Pro card contained a video of "D," one of the minors mentioned in the search warrant affidavit, having oral sex and sex with a male subject. No equipment was found at the home that would have permitted the viewing of the video. Bahr testified that the defendant's business, Humbolt Ag Services, had a connection with Pioneer.

Agent Larry Hedlund of the Iowa Department of Criminal Investigation ("DCI") testified that he met with "D." on September 17, 2010, while the search warrant was being executed. "D" told Hedlund that she had asked the defendant if he was concerned that his wife might find the pictures he was taking. Malcom responded that he was not because he kept the pictures in his office. Hedlund testified that he did not recall specifically sharing this information with the officers involved in executing the search warrant, but his normal practice would have been to do so.

DCI Special Agent Matt Anderson testified that immediately before he assisted in the execution of the search warrant at Humboldt Ag Supply, he received information from Hedland directing him specifically to search the center desk drawer in the defendant's office because evidence of contraband would be found in that location.

The government also placed into evidence transcripts of a series of recorded telephone conversations between DCI Special Agent Chris Callaway and the defendant on September 17 and 18, 2010. These conversations took place during and after the execution of the search warrant. Doc. No. 64-3 ("Def.'s Ex. B") at 1-17.

> On September 30, 2010, FBI Special Agent Jon Moeller
> applied for and obtained a federal search warrant authorizing
> the forensic analysis of the items seized from the defendant's
> home and business pursuant to Detective Bahr's search
> warrant. Doc. Nos. 64-4 and 64-5 ("Def.'s Ex. C").

Report and Recommendation at 1-6. After reviewing the record, I adopt all of Judge Zoss's factual findings that have not been objected to by Malcom.

## II. LEGAL ANALYSIS

### A. Standard Of Review

I review the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a de novo determination of
> those portions of the report or specified proposed findings or
> recommendations to which objection is made. A judge of the
> court may accept, reject, or modify, in whole or in part, the
> findings or recommendations made by the magistrate judge.
> The judge may also receive further evidence or recommit the
> matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. IA. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III
> judge of any issue need only ask. Moreover, while the statute
> does not require the judge to review an issue *de novo* if no
> objections are filed, it does not preclude further review by the
> district judge, *sua sponte* or at the request of a party, under a
> *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court *may* review de novo any issue in a magistrate judge's report and recommendation at any time. *Id*. If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while de novo review generally entails review of an entire matter, in the context of § 636 a district court's *required* de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)). Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were

"specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has been willing to "liberally construe[]" otherwise general pro se objections to require a de novo review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require de novo review, it is clear to me that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, I will strive to provide de novo review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give de novo review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the

advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed). I am unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy

itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, I believe one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and I may choose to apply a less deferential standard.[1]

---

[1] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings, *see Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will *not* result in a waiver of the right to appeal '"when the questions

(continued...)

As noted above, Malcom has filed objections to Judge Zoss's Report and Recommendation. I, therefore, undertake the necessary review of Judge Zoss's recommended disposition of Malcom's Motion to Suppress.

### B. Objections To Report and Recommendation

### 1. Summary of the Indictment

Malcom initially objects to Judge Zoss's summary of the Indictment because it does not refer to the criminal charges alleged in Count 7, the interstate transportation of a person with intent to engage in criminal sexual activity, and aiding and abetting such conduct, in violation of 18 U.S.C. §§ 2 and 2421. Judge Zoss's Report and Recommendation states:

> On December 16, 2011, the defendant was indicted on charges of sexual exploitation of children, conspiracy to sexually exploit children, and interstate transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. §§ 2, 2421, 2251(a), 2251(e), and 2423(a).

Report and Recommendation at 1. While the Report and Recommendation's summary of the Indictment does refer to §§ 2 and 2421, the criminal statutes allegedly violated in

---

[1](...continued)
involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed de novo, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g.*, *United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions de novo." (citation omitted)).

Count 7, the summary does not mention the underlying criminal conduct alleged in Count 7. Accordingly, Malcom's objection is sustained.

### 2. Witness testimony

Malcom also objects to Judge Zoss's decision to permit the prosecution to call Deputy Bahr, Agent Hedlund, and Agent Anderson at the evidentiary hearing and to all parts of the record and the Report and Recommendation referencing or relying upon their testimony. Malcom contends that since he is challenging the sufficiency of the search warrants on their face, only the information contained within the four corners of the affidavits may be considered in determining the existence of probable cause. Malcom argues it follows that the testimony of the three law enforcement officers is irrelevant to his motion.

Malcom is correct that "[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (quoting *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999) (internal quotation marks omitted); *accord United States v. Montes-Medina*, 570 F.3d 1052, 1060 (8th Cir. 2009); *United States v. Stults*, 575 F.3d 834, 843 (8th Cir. 2009); *United States v. Hart,* 544 F.3d 911, 913–14 (8th Cir. 2008). Judge Zoss, however, clearly recognized this at the hearing: "I agree completely that in terms of evaluating the warrant, I have to and must stick to the four corners of the warrant. . . [a]nd testimony is not appropriate for that." Transcript at 3. Moreover, there is no indication in the Report and Recommendation that Judge Zoss relied on the testimony of any of the three law enforcement officers in accessing whether probable cause existed for issuance of the search warrants.

Judge Zoss explained that while the testimony of the three law enforcement officers was irrelevant on the issue of probable cause for issuance of the search warrant, their testimony might prove relevant to the applicability of the *Leon* good-faith exception. Specifically, whether the officers acted in objectively reasonable good faith reliance on the search warrant. In analyzing whether an officer's belief in the warrant is reasonable, a reviewing court is not limited to the four corners of the search warrant application. The Eighth Circuit Court of Appeals has instructed that "'[w]hen assessing the objective [reasonableness] of police officers executing a warrant, [a reviewing court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge.'" *United States v. Houston*, 665 F.3d 991, 995 (8th Cir. 2012) (quoting *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (quoting in turn *United States v. Marion,* 238 F.3d 965, 969 (8th Cir. 2001) (internal quotation marks omitted)); *accord United States v. Thurman*, 625 F.3d 1053, 1057 (8th Cir. 2010). Deputy Bahr testified to his preparing the search warrant application and its execution at Malcom's house while Agents Hedlund and Anderson both testified about information they obtained prior to execution of the search warrant which was not included in the search warrant application. Agent Anderson also testified to the execution of the search warrant at Malcom's business. I conclude that Agents Hedlund and Anderson's testimony was relevant on the applicability of the *Leon* good-faith exception and Judge Zoss did not err in permitting their testimony.[2] Therefore, Malcom's objection is overruled.

---

[2]After Deputy Bahr testified, the prosecution informed Judge Zoss that it was not offering his testimony for the *Leon* issue but for a possible inevitable discovery argument. Transcript at 109. The prosecution ultimately did not press an inevitable discovery argument. Nonetheless, Deputy Bahr's testimony provided relevant admissible background information concerning the search warrant's preparation and execution.

### 3. *Nexus between evidence and the place searched*

Malcom next objects to Judge Zoss's conclusion that the search warrant application showed the requisite nexus between the items sought in the search warrant and the place to be searched. He contends that Judge Zoss incorrectly interpreted the Eighth Circuit Court of Appeals's decision in *United States v. Summage*, 481 F.3d 1075 (8th Cir. 2007) and erred in rejecting his argument that *Summage* was distinguishable from this case.

A search warrant application must provide "'evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue.'" *United States v. Alexander*, 574 F.3d 484, 490 (8th Cir. 2009) (quoting *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000)); *accord Houston*, 665 F.3d at 996 (quoting *Tellez*, 217 F.3d at 550); *see Summage*, 481 F.3d at 1078. The requisite nexus does not require certainty but "means 'a *fair probability* that contraband or evidence of a crime will be found in a particular place' given the circumstances set forth in the affidavit.'" *Tellez*, 217 F.3d at 549 (internal citation omitted) (emphasis added). "'Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant. . . .'" *Alexander*, 574 F.3d at 490 (quoting *Summage*, 481 F.3d at 1078) (internal quotation marks omitted).

Here, the nexus between the alleged criminal activity and the place to be searched is provided by common-sense inferences based on the nature of the offenses. It was reasonable to presume that Malcom would maintain possession of the videotapes and photographs he had taken of D and reasonable to infer that he would have those items at his residence or business. Federal courts of appeals have acknowledged that few places are more convenient than one's residence for concealing the fruits of a crime:

> "The justification for allowing a search of a person's residence
> when that person is suspected of criminal activity is the

> common-sense realization that one tends to conceal fruits and
> instrumentalities of a crime in a place to which easy access
> may be had and in which privacy is nevertheless maintained.
> In normal situations, few places are more convenient than
> one's residence for use in planning criminal activities and
> hiding fruits of a crime."

*United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting *United States v. Green,* 634 F.2d 222, 226 (5th Cir. 1981)); *accord United States v. Pofahl*, 990 F.3d 1456, 1475 (5th Cir. 1993) (quoting *Green*, 634 F.2d at 226); *see United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008) ("Evidence that the defendant is in possession of contraband that is of the type that would normally expect to be hidden at their residence will support a search."); *United States v. Jenkins,* 901 F.2d 1075, 1080–81 (11th Cir. 1990) (holding that nexus between items to be seized and defendant's home can be established circumstantially where contraband is capable of being hidden in residence).

Here, Malcom allegedly admitted to D that he was going to add the digital videotapes and photographs he had taken of her to his collection, and courts have specifically recognized "the common practice of child pornography collectors of storing illegal images on their home computers. . ." *United States v. Moyer*, 236 Fed. App'x 61, 63 (9th Cir. 2007); *see United States v. Pickering*, 139 F.3d 895 (4th Cir. 1998) (table decision) ("[W]e agree with the district court's common sense conclusion that purchasers of child pornography are most likely to view their acquisitions in the privacy of their homes."). The likelihood of Malcom keeping his digital videotapes and photographs of D was increased by the fact that he allegedly paid a significant amount of money, over $750, to photograph her. It is reasonable to infer that Malcom, having alleged to be actively and repeatedly producing child pornography using electronic devices that are meant to be connected to a computer would also store his "collection" of child pornography on his computer. *See United States*

*v. Leowitz*, 647 F. Supp.2d 1336, 1354 (N. D. Ga. 2009)("'[T]he purpose of a digital camera is to take digital photographs, and these photographs are designed to be viewed, stored and often transmitted via a computer.'")(quoting *United States v. Sarras,* 2007 WL 3231797, at *8 (M.D. Fla. October 30, 2007)), *affirmed*, 676 F.3d 1000, 1011 (11th Cir. 2012). It is equally reasonable to infer that a personal computer is likely to be kept at either a person's home or business.

In *Summage*, 481 F.3d at 1078, the Eighth Circuit Court of Appeals reversed the district court's suppression of evidence for failure to show a nexus between the alleged criminal activity, producing and possessing child pornography, and the place to be searched, the defendant's current residence. The court of appeals concluded that where defendant videotaped and photographed a sexual encounter between a mentally retarded male and a female at his prior residence, it was reasonable to presume that defendant would maintain possession of the videotape and photographs and reasonable to infer that he would have those items at his new residence. *Id*. Malcom contends that *Summage* is distinguishable because at least some of the conduct there occurred at the defendant's residence. However, the conduct alleged here is comparable to that in *Summage* because in both cases the search at issue involved the defendant's current residence and the photographs and videotape that were the subject of the searches occurred at a different location. The inference drawn in *Summage*, that defendant would maintain possession of the videotape and photographs and have those items at his residence, is equally applicable here. Thus, I conclude that there was a sufficient nexus between Malcom, his alleged criminal activity, and his residence to support a finding of probable cause to search his residence.

The search of Malcom's business is justified for the same reasons as the search of his home, the common-sense inference that Malcom, as an alleged collector of child

pornography, could conceal his collection at his place of business since it is a place providing him both easy access to and the privacy to view his child pornography collection. Because Malcom is married, it was reasonable to assume that his business might actually prove to be a more convenient place for him to hide and view his collection of child pornography. Therefore, I also conclude that there was a sufficient nexus between Malcom, his alleged criminal activity, and his business to support a finding of probable cause to search his business. Malcom's objection is overruled.

### 4. *Leon good faith exception*

Malcom also objects to Judge Zoss's conclusion that, even if the warrant application failed to establish a sufficient nexus between the items sough in the warrant and Malcom's home or business, the search is lawful under the good faith exception of *United States v. Leon*, 468 U.S. 897 (1984). Specifically, Malcom objects to Judge Zoss's conclusion that "[i]n light of *Summage*, it cannot be said that an officer executing the warrant would have had 'have no reasonable grounds for believing that the warrant was properly issued,' or that the warrant was 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Report and Recommendation at 14 (quoting *Leon*, 468 U.S. at 923).

"The Fourth Amendment commands that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation.'" *United States v. Houston*, 665 F.3d 991, 994 (8th Cir. 2012) (quoting *United States v. Fiorito,* 640 F.3d 338, 345 (8th Cir. 2011) (quoting in turn U.S. CONST. amend. IV)). "'The ordinary sanction for police violation of Fourth Amendment limitations has long been suppression of the evidentiary fruits of the transgression.'" *Houston*, 665 F.3d at 994 (quoting *Fiorito,* 640 F.3d at 345). However, in *Leon*, the United States Supreme Court held that evidence obtained pursuant to a subsequently invalidated search warrant need not be excluded from the prosecution's

case in chief if the executing officers acted in objectively reasonable reliance on the issuing court's determination of probable cause and technical sufficiency. *Id.* at 922-23. *Leon's* good-faith exception does not apply:

> "(1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*'; and (4) when the warrant is 'so facially deficient" that no police officer could reasonably presume the warrant to be valid.'"

*Houston*, 665 F.3d at 995 (quoting *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (emphasis in original)).

Here, no evidence exists in the record to suggest that the state magistrate did not remain neutral and detached when making his probable cause determination. Moreover, no evidence has been offered which would suggest that the state magistrate "wholly abandoned [his] judicial role." *See Leon*, 468 U.S. at 923. Malcom argues that *Leon's* good-faith exception does not apply because that state warrant is so facially deficient that no law enforcement officer could reasonably presume the warrant is valid. "'When assessing the objective [reasonableness] of police officers executing a warrant, we must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge.'" *Houston*, 665 F.3d at 995 (quoting *Proell*, 665 F.3d at 430 (quoting in turn *United States v. Marion,* 238 F.3d 965, 969 (8th Cir. 2001)) (alterations in original and internal quotation marks omitted). I conclude that a law enforcement officer, knowing that Malcom had paid D to photograph her naked, that Malcom had told D that he had a collection of such photographs, that Malcom was married

and owned Humboldt Ag Services, and that Malcom had told D that he kept the photographs of her at his office, could have reasonably presumed the state warrant to search for child pornography at Malcom's home and business to be valid. Moreover, under these facts, by excluding the evidence, I would be "[p]enalizing the officer for the magistrate's error, rather than [her] own, [which] cannot logically contribute to the deterrence of Fourth Amendment violations." *Leon,* 468 U.S. at 921. Malcom's objection is overruled.

### 5.     *Fruit of the poisonous tree*

Malcom next objects to Judge Zoss's conclusion that the evidence obtained from execution of the federal search warrant, as well as his recorded statements was admissible against him and not subject to exclusion under the "fruit of the poisonous tree" doctrine. The exclusionary rule operates to bar evidence obtained either directly or indirectly from unlawful police action. *See Wong Sun v. United States,* 371 U.S. 471, 484 (1963). In *Wong Sun*, the seminal case defining the fruit of the poisonous tree doctrine, the United States Supreme Court articulated that derivative evidence, such as physical evidence, a confession, or the testimony of a witness, is not "'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Id.* at 488. Rather, derivative evidence must be suppressed as "fruit of the poisonous tree" if it was discovered by exploiting an illegal search. *See id.; see also Oregon v. Elstad,* 470 U.S. 298, 305-06 (1985) (noting that the "fruit of the poisonous tree" doctrine is drawn from *Wong Sun,* where "the Court held that evidence and witnesses discovered as a result of a search in violation of the Fourth Amendment must be excluded from evidence"). In determining whether to apply the "fruit of the poisonous tree" doctrine, a court must determine whether "the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged

of the primary taint." *Id.* at 488. For the reasons previously stated, because I find that the state search warrant was valid, the fruit of the poisonous tree doctrine has no application here, and none of the evidence resulting from execution of that warrant is suppressed. Malcom's objection is overruled.

### III. CONCLUSION

Therefore, for the reasons set forth above, I, upon a *de novo* review of the record, accept Judge Zoss's Report and Recommendation and **deny** Malcom's Motion to Suppress.

**IT IS SO ORDERED.**

**DATED** this 26th day of June, 2012.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA